Good morning, ladies and gentlemen. We welcome District Judge John DiIulio of the Northern District of Indiana, who is sitting with us today. Thank you. Our first case for argument this morning is Leibundguth Storage & Van Service against the Village of Downers Grove. Mr. Schwab. Good morning. May it please the Court. My name is Jeffrey Schwab, and I represent Leibundguth Storage & Van Service. The Village of Downers Grove's sign ordinance imposes size and number restrictions on a content-based manner. The ordinance imposes size and number restrictions on commercial speech, like Leibundguth's, but imposes no size and number restrictions on some non-commercial speech. Also… Counsel, let me tell you what my big problem with your argument is. It looks to me like political speech, like a political sign, is subject to the same size and number restrictions as any other sign. Political signs less than 12 square feet don't need a permit, but nobody could put up a political sign the size of your client's signs. Am I misreading the ordinance? No, you're not, Your Honor. And, in fact, that's our reading of the ordinance as well. So that's what gives me the problem, because your complaint is about the size and number limits, not about the permit requirement, and no political or other sign can be as large or as numerous as your client's signs. That's incorrect, Your Honor, because Section 9.030 provides that some non-commercial signs are permitted without a permit and also impose no size and number restrictions. So those would be government signs, temporary decorations, temporary signs at a residence commemorating a personal event, non-commercial flags, and memorial signs and tablets. So there's no size and number restrictions on those, but there are size and number restrictions on other non-commercial signs and commercial signs. And so we have two bases for why that's content-based. Let's go through that again. The ordinance is regulating only private speech, right? Correct. A difference in how private speech and government speech exist is not content discrimination. So you're now relying on the difference between permanent signs and temporary signs? That doesn't sound like content discrimination. No, Your Honor. The ordinance provides that non-commercial flags are also not required to obtain a permit and also have no size and number restrictions. What is it that exempts them from the size restrictions or from the paint-on-the-wall restriction? Well, with respect to the size and number restrictions, Section 9.030 provides that some signs aren't required to obtain a permit, and then those signs are subject to their own size and number restrictions. So, for example, the ordinance in Section 9.050 provides that non-commercial and political signs don't require a permit so long as they're 12 square feet or less. But with these signs that I've mentioned, the temporary signs at a residence, the non-commercial flags, there's no size and number restriction in Section 9.030. The statute seems to be of universal application. What is it that exempts anything from it? Your brief relies not on the language of the ordinance but on a report prepared by a local official. Is there anything in the language of the ordinance you're relying on? Yes, Your Honor, and I'd like to make a distinction between the size and number restrictions and the painted sign ban. So our argument with respect to the size and number restrictions does not rely on that staff report. Our argument with respect to the painted sign ban does. So if I could, I'd like to address the size and number restrictions first, since Your Honor had addressed those with his first question, and then if it's all right, I'll address the painted sign ban. Our argument with respect to the size and number restrictions is that it's content-based for two reasons. First, it requires commercial signs to be subject to size and number restrictions of Section 9.050. But it doesn't allow some non-commercial signs. It doesn't apply non-commercial signs to any or certain non-commercial signs to any size and number restrictions. And also, it allows some non-commercial signs less than 12 square feet. It doesn't require a permit. So you're arguing that 9.50 should be reviewed for strict scrutiny? That's correct. But didn't you concede before the District Court judge during summary judgment that Central Hudson and intermediate scrutiny applied, and therefore, haven't you waived that argument? No, I haven't, Your Honor, and the reason is because in our complaint and in our motion for summary judgment, we made arguments in the alternative. So we first argued that it was content-based, and then we made an argument in the alternative that if it wasn't content-based and Central Hudson applied, then it also failed that Central Hudson test. Our other argument for why the size and number restrictions are content-based is based on the overbreadth doctrine that Liebiguth has standing based on the overbreadth doctrine to challenge the regulations subjecting some non-commercial signs to size and number regulations, such as the 12 square feet limitation, but not other non-commercial signs. So in this case, it allows non-commercial flags to be subject to no size and number restrictions, but it requires... That's where you lose me. Why are flags not subject to the size and number restrictions? Because the ordinance doesn't impose the size and number restrictions. It covers all signs. Indeed, that's part of your argument, that it's universal. That's right, but Section 9.030 provides a specific exemption for non-commercial flags that say it doesn't require a permit, and therefore there are no size and number restrictions applied to it. But if they're deemed to be speech, if a mural, a painted mural or a painted flag is deemed to be speech, then doesn't it come within the province of the same ordinance? Yes, Your Honor. You're addressing the issue on the painted sign ban. Our argument there is that the village has admitted that at least some painted murals and painted flags are allowed despite the general ban on painted signs. The village says that there are some painted flags and murals that aren't signs, and therefore they're not subject to the painted sign ban. But all painted flags and murals communicate speech, and therefore if the village is saying that there are some flags and murals that aren't subject to the painted sign ban while subjecting others to the painted sign ban, then that's a distinction based on the content of speech, because it's saying that some speech is allowed but other speech is not. The distinctions between commercial and non-commercial speech are inherently based on the topic and therefore are content-based. Under Reed, in this court's case, is applying Reed, restrictions that apply because of the topic, like commercial speech, the distinctions between commercial speech and non-commercial speech, are content-based. In this court's case in Patriotic Veterans v. Zoller, this court found that an anti-robocall statute, providing an exception to the anti-robocall statute, would treat robocall advertising and other non-political speech less favorably than political speech. Because the ordinance places size and number restrictions on commercial signs and some non-commercial signs, but not other non-commercial signs, the ordinance is content-based. But even if Reed doesn't require this court to subject government restrictions that treat commercial speech less favorably than non-commercial speech to strict scrutiny, this court should still subject these regulations to strict scrutiny because the ordinance treats some non-commercial signs less favorably than commercial signs. Even if that's true, doesn't the substitution clause remedy that? No, the substitution clause doesn't remedy that because it provides that an existing sign, such as a non-commercial sign or a commercial sign, is allowed to replace its copy with non-commercial content. But that doesn't change the fact that under Section 9.030, there are some non-commercial signs that are allowed without any size and number restrictions, so that there are some signs, non-commercial and commercial signs, that are subject to size and number restrictions, but there are some signs that aren't required to meet size and number restrictions, and therefore that's content-based. If Section 9.050 applies only to commercial signs, like the village is asserting, then non-commercial signs would be limited under 9.030 to 12 square feet in total, which would mean that the ordinance would actually treat commercial signs more favorably than non-commercial signs. As Your Honor said, the substitution clause would supposedly remedy that, but it still wouldn't remedy the fact that the ordinance provides that some non-commercial signs are not subject to any size and number restrictions, while other non-commercial signs, either via the substitution clause in 9.050, or the fact that they're limited to 12 square feet without a permit, are subject to size and number restrictions. The district court said that Leibenguth had admitted that Section 9.050 applied only to commercial speech, but Leibenguth never made that admission. In fact, Leibenguth only admitted that Section 9.050 applies to commercial speech. Admitting that an ordinance regulates commercial speech is not the same as admitting that an ordinance regulates only commercial speech, and therefore, Section 9.050 applies to both commercial and non-commercial speech. The painted sign ban also is content-based, because the village admits that it doesn't apply to at least some painted flags or murals. But even if this court doesn't think that this admission is sufficient to show that the painted sign ban is content-based, this admission, along with the fact that the village allows painting on an exterior wall generally, shows that this painted sign ban can't survive intermediate scrutiny, because it's not narrowly tailored to serve an interest in aesthetics. Indeed, the village even told Leibenguth that it could remove its painted signs simply by painting over them. And the three reasons that the village provides for the ban, that painted wall signs require ongoing maintenance, that paint on a wall is subject to water damage, and that painted signs are hard to remove, the fact that the village allows painted flags and murals, and that the village allows paint on a wall in general, shows that these reasons are insufficient. The village can't seriously believe that these three issues are important to Leibenguth's signs, but not important when Leibenguth merely paints over the signs. Of course, those ongoing maintenance, water damage, and the removal of paint on a wall are issues as well. And even if this court doesn't think that the size and number restrictions are content-based, they'd still fail intermediate scrutiny, because they're not narrowly tailored to serve an interest in aesthetics for traffic safety. The village has never produced any evidence to show that the size and number restrictions actually serve the interest in traffic safety and aesthetics. The village certainly has provided evidence that it has an aesthetic interest in making these regulations. Don't courts give municipalities great deference relative to the aesthetic interests? Yes, Your Honor, they do, and the village has produced evidence. The problem with the village's evidence is that it's never connected anything in the evidence to a specific aesthetic interest. In fact, it never pointed to one document. Despite providing 900 pages, it's never pointed to one document, it's never pointed to one photo, and it's never pointed to one specific piece of evidence in another provision that says, this is the reason that we need these size and number restrictions, because of this specific aesthetic interest. Didn't they submit 180 photographs to demonstrate the concerns they had about painted signs in the village? They submitted photographs, but they've never pointed out any of those photographs related to the size and number restrictions. And the district court actually recognized this insufficiency with respect to the traffic safety interest. The district court said that the village's evidence did not suffice for purposes of traffic safety. Even though the village provided the same amount of documents, it even provided treatises. But the district court said that the village had never connected anything in those treatises or anything in the documents it produced to a specific traffic safety interest. And similarly, the village has never provided any specific tie to any piece of evidence that it produced to any specific aesthetic interest. We don't know why, what aesthetic reason that the village has to limit the size and numbers of signs. It just has pointed out the fact that it had a process where it provided evidence of other municipalities. But that doesn't actually meet the village's burden. I'm not sure what you're looking for. It's an old saw in economics, as the Romans put it. De gustibus non disputandum est. That is, there's no accounting for taste. When somebody says, we have an aesthetic interest, they're asserting what our taste is. How does one prove taste, prove what looks good, prove what looks bad? Well, Your Honor, if the village only has to prove what they think looks good, then signs are never subject to First Amendment scrutiny because the village can just say, well, we think this looks good, therefore aesthetics, and unless it's content-based, then the village can do it. And I don't think that's what the precedent supports. You're not addressing my question. You seem to be thinking that aesthetics is subject to empirical proof, to a contest of affidavits by people who have Master of Fine Arts degrees. How would one do it in your world? Well, for example, let me just point out the way that the village has tried to do it with a painted sign ban. With a painted sign ban, it provided three reasons why it needed to ban painted signs. As I explained, I don't think those reasons, which are ongoing maintenance of signs, that they're subject to water damage and that they're hard to remove, I don't think that those actually are narrowly tailored to serve the interest, but it provided three objective criteria that this court can review. And I think that it also has to do that. In fact, it never did that. It never even said, like, here is the specific thing, the specific reason that we need to limit signs. And so there's nothing for this court to review because the village actually hasn't even done anything to meet its burden. We're not requiring that the village provide detailed expert analysis, but the village hasn't provided any analysis. And so therefore... Well, haven't they talked about what they've done leading up to the passage of this ordinance, the submission of the photographs, the reviewing ordinances of nine surrounding communities, the public hearings to get input about the potential restrictions? So, I mean, why doesn't that constitute sufficient evidence of a sincere aesthetic interest? Because it doesn't tie any of those reasons specifically to the regulations that it's enacted here. What exactly is a reason for why it needs to regulate sign ordinances to this specific number? Why regulate the size this small? And why do it in this way? They haven't explained any of that. And so they have to at least explain. We're not asking that this court require them to overcome some burden of evidence that is extremely strong. We're just asking the court that they provide some justification for the specific reason that they did this. And they haven't, other than saying aesthetics. I will reserve the rest of my time. Certainly, Mr. Schwab. Mr. Day. May it please the court. My name is Scott Day. I have the privilege of representing Defendant Applee, the village of Downers Grove. We have tried desperately throughout the litigation to focus on the three specific regulations that were challenged by this particular plaintiff appellant. Those three regulations, one prohibits signs that are painted directly on a wall, fence, or roof. Two, there's a provision that provides for maximum size of wall signs, as distinguished from a whole host of other signs. And then there's a provision that sets a maximum size for collective signs for every lot in the city at 300 square feet, regardless of what type of sign that is. The first, and we think the easiest, is the signs painted directly on a wall. We believe that the language of the ordinance is clear, that they are expressly prohibited. We believe that the language of the ordinance is clear, that it is an absolute ban, regardless of what the message from the sign is. The plaintiff appellant has two such signs. They've been in existence on his building since 2005, when this ordinance was adopted, and we now have nonconforming signs that are 12 years old. The district court held that this was a time, place, and manner regulation subject to the Clark test, which has been in place since 1984. It essentially has three elements, content neutral, two, narrowly tailored to address a substantial governmental interest, and ample alternatives for other speech. We don't think that there is any dispute over the content neutrality. That is the language of the ordinance itself. We know that the plaintiff in this case has disputed that. We think that the language of the ordinance on content neutrality is clear. As it relates to the last element, the ample alternatives, wall signs are permitted, truck signs are permitted, monument signs are permitted, projection signs, shingle signs, awning signs, window signs, and up to 300 square feet for this particular site. This particular plaintiff appellant has well in excess of 500 square feet, almost 300 square feet, which is double what everybody is permitted in the village. I think the major focus of their presentation has been on the second element, narrow tailoring and or substantial governmental interest. The narrow tailing argument... The principal argument, as I understand it, is that this ordinance represents content discrimination if only because it is possible to paint murals of any size anywhere. You can just imagine a mural that exalts Che Guevara or Fidel Castro as making a political statement. Now, Mr. Schwab said that as a result of the fact that the mural doesn't need a permit, it also isn't subject to any size or number requirement. Is that your understanding? No. And why not? If a mural conveys speech, if it falls... Well, the mural I've just given obviously is speaking. And I believe that that would be... Or a mural with an American politician's face on it. Yes. Right? That's obviously political speech. Now, why under the ordinance is that mural subject to the size limit, the number limit, or the don't paint it on a wall sign rule? As it relates to the don't paint it on a wall sign, regardless of what the message is, if it is political speech, nonpolitical speech, commercial speech, regardless of what it is. If it is speech that is painted directly onto the wall, it's prohibited in the village. That's part one. The second part of your question? Why, in your view, what language of the ordinance are you relying on to say that that mural, a gigantic bust of Ronald Reagan, is subject to the size and number limits? The size limitation is expressed in two different sections of the ordinance. We did not litigate this before the district court, but Section 9.050 addresses sign regulations generally, the maximum total sign area for... Yeah, look, Mr. Schwab's argument, you're not responding to Mr. Schwab's argument. His argument is that under 9.030, anything that does not require a permit is not subject to the size and number limits. That's his contention. I'm looking for what your view is on that contention. The size limitations are with respect to all signs. They are size limitations in Section 9.050. They address signs generally in every district other than the downtown business district and the Fairview district. The maximum total sign area for the other two districts in the communities in Section 9.060. So regardless of what type of sign you have, commercial, noncommercial, political, any other type of sign, collectively, the signs that you have on your parcel of property, you get 300 square feet. That's it. So you agree that 9.30 modifies 9.50? No, it does not. 9.50 has provisions that address signs generally in addition to the commercial wall sign provisions. 9.050 does not limit itself to commercial signs. 9.050 specifies that the maximum total sign area that you are permitted on your site is 300 square feet. There's a limitation. There's some exemptions if you have a deeper parcel of property. 9.050 sets the size limitation for everything other than the downtown business district and Fairview, and 9.060 sets that same 300 square foot limitation for downtown business district and Fairview. So regardless of what your collective signs are, you can have a commercial sign, a noncommercial sign, a political sign collectively. You're getting 300 square feet in the village. That's the limitation. So 9.50 regulates more than just commercial speech? The Section 9.050 that addresses the wall size limitation collectively does. It addresses all collective wall sign provisions. Now, we were talking about narrow tailoring. The defendant insists that this provision is, first, under-inclusive because it outright exempts flags and murals. We don't think that that is accurate. If it is a flag or a mural that is communicating any type of speech, we believe that that is covered, and it is prohibited from being painted directly on a wall. The second argument that was rejected by the district court is that there was selective enforcement in that the provision seemed to prohibit flags and murals and that the village was allowing flags and murals. That particular argument came only in the Rule 59 motion after trial, and the district court declined to entertain that. Which leaves the final element, which is the significant governmental interest. And as it relates to painted signs, the significant governmental interest is specifically addressed in aesthetics within the ordinance and also visibility. Now, aesthetics have to do with the fading, chipping, increased deterioration, loss of visibility, brick fracture, ghost signs, and removal problems associated with signs that are painted directly onto the building itself. And then that visibility issue is actually a function of traffic safety to the extent that the wayfinding function, which is mentioned in these ordinances, the wayfinding function allows a driver of a motor vehicle, a pedestrian, or a bicyclist to recognize and identify its destination by wall signs in advance of the necessity of making an emergency turn. That is, by definition, the wayfinding function. If you can't read the sign, if the sign has lost visibility, if the sign has deteriorated in visibility, then the wayfinding function is defeated. And understand from our perspective, traffic safety and aesthetics are in combat. Traffic safety requires clear visibility. It requires the elimination of obstruction. It requires the ability of drivers of motor vehicles to make safe traffic movements on a timely basis. Aesthetics, the easiest thing for aesthetics in a community, if all you're talking about is the aesthetics of a sign, is to minimize their size, minimize their visibility. And in response to the appellant's argument, how do you connect your aesthetic concerns, your safety concerns, with the specific parameters of the ordinance in terms of the sizes that serve as the limitations? It is a balancing. In the case of the Village of Downers Grove, what they've done is they have calibrated the size restriction for wall signs predicated upon the amount of roadway frontage that is presented by each individual tenant. Your ability to communicate is directly predicated upon the size of your frontage. And your ability to present its opportunity for viewing to the tenant predicated upon that measurement. Now, the balancing and the aesthetic issue is an absolutely purely function of local government and the legislative process. And that's the extent to which we submitted to the court a very detailed review of the 18-month process that the village went through in order to adopt this particular set of ordinances. And that started with an initial study through the Economic Development and Strategic Planning Subcommittee of the village. It then went to gathering 180 photos of existing sign problems that were identified throughout the community. Additional staff study incorporated the legal and zoning professionals of the community who went out and studied nine nearby communities to see how they balanced their traffic safety issues, their land use issues, and their sign regulations. Over 400 letters were sent out to the business leaders in the communities and stakeholders so that the individuals who are most impacted by sign regulations would have direct input into the process and would be aware that their local government was processing new sign regulations. Following this, there was a formation of a joint commission that incorporated both the planned commission of the village as well as the Economic Development Commission. Photographic studies of LaGrange signs, Lyle signs, Naperville signs, and as far away as Charlevoix, Michigan, were then studied by the joint commission. Ultimately, input was solicited from the Chamber of Commerce in the community as well as an entity called the Downersville Downtown Management Board. Through this process, they then conducted two public hearings with the planned commission and then presented both first and second reading to the village. The vetting process that we're talking about assures that the people who are impacted by the sign regulations, the stakeholders, the community, the people that live in the community, they understand the balancing decisions that are being undertaken by the village and they have full opportunity for input. They were solicited, they did participate. Ultimately, the ordinance that you see is the result. So relative to 920, what evidence suggests that a painted sign presents greater aesthetic concerns than a painted wall or a painted mural or a painted flag? I think that if you look at the findings that were adopted in reference to the specific revision to the painted on wall sign, the community spoke in detail of those that they felt were most important. The village board actually adopted in specificity the specific aesthetic problems associated with the signs painted directly onto the wall. Is that to say that signs that are manufactured aren't ugly or can't be ugly? Of course they can. But they don't present the same fading, deterioration, loss of visibility, ghost sign, brick fracture. The brick fracture is a real problem with painted signs because the moisture actually gets behind the paint and the brick literally explodes the sign off of the wall. And if you look at the documentation that we submitted to this particular panel, you can see that each one of these problems is suffered by the Liebenguth signs. They are very apparent visually from the signs that we have submitted. Now that brings us to the total square footage of the signs and the total 300 square foot as well as the three versus one wall sign. Essentially the village does not permit three wall signs on a single frontage. It doesn't permit three wall signs on a single building. And in this particular case, we did amend the ordinance to allow wall signs to be presented onto the Burlington northern frontage during the course. So we're essentially down to two wall signs on this property. I'm sorry, three wall signs where only two are permitted. And then the total square footage that's permitted is the 300 square feet. So essentially what the village is saying is, please remove the signs that are painted directly on the wall. Get your wall signs in compliance with the size limitation that we've set for everybody else in the community. And make sure that if you're only permitted two wall signs, you only have two. Now we adopted in addition to this a substitution clause. I'm lost as it relates to how our sign ordinance is content neutral. I think the substitution clause completely neutrals that particular issue. And as I started, we have tried very hard throughout the course of this dispute to litigate the three signs that are applicable to this particular plaintiff. We have throughout the process confronted an effort to argue the constitutionality of the entire sign ordinance. And litigate non-commercial signs and commercial signs, et cetera. That's a standing issue. We don't think that that is in compliance with the overbreadth doctrine. And we believe that it's a violation of the overbreadth doctrine and standing to attempt to argue provisions that do not apply to this plaintiff. That's the end of my argument. I'll be happy to address any additional questions. Thank you, Mr. Day. Anything further, Mr. Schwab? No. Opposing counsel suggested that section 9.050 applies to both commercial and non-commercial signs. And that's exactly the opposite of what they stated in their brief. They said that non-commercial signs and political signs are not subject to the restrictions of 9.050. And opposing counsel ended his argument. Why don't we look at what the actual language of the ordinance is? Is there any language in the ordinance distinguishing commercial from other signs? No, Your Honor. And, in fact, our position is that section 9.050 does apply to commercial and non-commercial signs. That's what I thought your view was. But the district court found that we didn't have standing to challenge the discriminatory treatment of non-commercial signs via the overbreadth doctrine because it said, Mr. Day argued, that section 9.050 only applied to commercial speech. So the village can't have it one way when it wants to argue that its sign ordinance is constitutional, but another way when it's saying that we don't understand what the ordinance says rather than what the lawyers are arguing. That's our position, Your Honor. My second point is that opposing counsel argued that the painted sign ban is necessary for traffic safety purposes. But they never argued this at any point in the litigation. And, in fact, Liebengu's sign on the back of its building has no application to traffic safety whatsoever because it doesn't face a road. It faces the railway. So there's no application for painted signs in traffic safety. And, in addition, the district court found that the village's argument for traffic safety with respect to size and number restrictions and the painted sign ban was insufficient because... Thank you, counsel. Thank you, Your Honor. The case is taken under advisement.